IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**ANITA C. VAN DAME,**

        **Plaintiff,**

v.                                                                           CIV 02-1048 LAM

**JO ANNE B. BARNHART,**
**Commissioner of Social Security**
**Administration,**

        **Defendant.**

# MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Reinstatement of Benefits, or in the Alternative, for a Rehearing (*Doc. 10*). In accordance with 28 U.S.C. § 636(c)(1) and FED. R. CIV. P. 73(b), the parties have consented to having the undersigned United States Magistrate Judge conduct all proceedings and enter final judgment in this case. The Court has reviewed Plaintiff's motion and the memorandum in support of the motion (*Doc. 11*), Defendant's response to the motion (*Doc. 12*), Plaintiff's reply to the response (*Doc. 13*) and relevant law. Additionally, the Court has carefully reviewed and considered the entire administrative record (hereinafter, "*Record*" or "*R*."). For the reasons set forth below, the Court **FINDS** that the decision of the Commissioner of Social Security (hereinafter, "Commissioner") should be **AFFIRMED** and Plaintiff's motion be **DENIED**.

## I. Procedural History

On June 24, 1997, the Social Security Administration found Plaintiff disabled within the meaning of the Social Security Act and entitled to disability insurance benefits. (*R. at 40.*) Plaintiff

was determined to be disabled beginning on June 30, 1996, because she suffered from idiopathic cardiomyopathy[1] and her condition satisfied the requirements of Listing § 4.04B[2]. (*R. at 40, 44*.) In December of 2000, following a continuing disability evaluation, the Social Security Administration determined that Plaintiff was no longer disabled because her medical condition had improved and she was able to perform most types of light work. (*R. at 41, 44-47*.) This determination was affirmed following a disability hearing. (*R. at 42-43, 48-49, 52-67*). In May of 2001, Plaintiff requested a hearing before an administrative law judge. (*R. at 70-71*.) In her request for hearing, Plaintiff alleged that she continued to be disabled and entitled to benefits. (*Id.*)

The Administrative Law Judge (hereinafter, "ALJ") conducted a hearing on March 14, 2002. (*R. at 23-39.*) Plaintiff was present at the hearing and represented by an attorney. (*R. at 25*.) On April 26, 2002, the ALJ issued his decision in which he affirmed the cessation of benefits and made the following findings, *inter alia,* with respect to Plaintiff: (1) claimant has not engaged in substantial gainful activity since her initial determination of disability on June 24, 1997; (2) claimant currently has the severe impairment of "moderate, slightly dilated cardiomyopathy"; (3) claimant's impairment does not meet the severity requirements of any listed impairment and, more specifically, claimant's impairment does not meet the requirements of Listing § 4.04B[3]; (4) while generally credible,

---

[1]"Cardiomyopathy" is a "[d]isease of the myocardium. As a disease classification, the term is used in several different senses, but is limited by the World Health Organization to: 'Primary disease process of heart muscle in absence of a known underlying etiology' when referring to idiopathic cardiomyopathy." Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 290 (27th ed., Lippincott Williams & Wilkins 2000).

[2]20 C.F.R. Pt. 404, Subpt.P, App.1, § 4.04(B).

[3]The ALJ found that Plaintiff's impairment no longer met the requirements of Listing § 4.04B because she did not have "an ejection fraction of 30% or less, resulting in marked limitation of
(continued...)

claimant's testimony of subjective complaints and functional limitations does not support a finding of continued disability; (5) claimant underwent medical improvement as of December 1, 2000; (6) claimant's current level of functioning has improved since the comparison point decision of June 24, 1997; (7) claimant has the residual functional capacity (hereinafter, "RFC") to perform a significant range of light work; (8) claimant's past relevant work as an executive director was sedentary as she performed it; (9) claimant's past relevant work as an executive director does not entail any functional demands beyond those outlined in the ALJ's RFC finding; (10) claimant can perform her past relevant work and is, therefore, not disabled; (11) claimant underwent medical improvement related to her ability to work as of December 1, 2000; (12) claimant has the RFC to perform her past relevant work as an executive director; and (13) claimant's disability status was properly ceased as of December 1, 2000.  (*R. at 13-16.*)

After the ALJ issued his decision, Plaintiff filed a request for review on May 24, 2002. (*R. at 7-9.*)  On July 26, 2002, the Appeals Council denied the request for review (*R. at 5-6*), making the ALJ's decision the final decision of the Commissioner.  Plaintiff subsequently filed her complaint for court review of the ALJ's decision on August 21, 2002 (*Doc. 1*).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *See Hamilton v. Sec'y. of Health & Human Services*, 961 F.2d 1495, 1497-1498 (10th Cir. 1992).

---

[3](...continued)
physical activity, demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity."  (*R. at 14.*)

Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y. of Health and Human Services*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (further citation omitted)).  Substantial evidence is more than a mere scintilla of evidence but less than a preponderance. *See, e.g., Sisco v. U. S. Dep't. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  In making the substantial evidence determination on review, the Court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.  *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

## III.  Plaintiff's Age, Education, Work Experience and Medical History

Plaintiff is currently sixty-three years old.  (*R. at 26-27.*)  She has six years of college-level education.  (*R. at 111.*)  Prior to her initial disability determination, Plaintiff worked as an executive director for seven years.  (*R. at 134.*)  The *Record* includes a detailed description by Plaintiff of her job duties as executive director.  (*R. at 134-136, 146.*)  Plaintiff previously held jobs as a project manager, court security supervisor and radio dispatcher.  (*R. at 137-145.*)

Plaintiff was determined to be disabled, beginning on June 30, 1996, because her condition satisfied the requirements of Listing § 4.04B.[4]  (*R. at 40.*)  This determination was based on her

---

[4]The relevant requirements of Listing § 4.04B are as follows:
> Ischemic heart disease, with chest discomfort associated with myocardial ischemia, as described in 4.00E3, while on a regimen of prescribed treatment . . . [w]ith . . . [i]mpaired myocardial function, documented by evidence . . . of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion **with left ventricular ejection fraction of 30 percent or less**, and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and resulting in marked limitation of physical activity, as demonstrated by fatigue,

(continued...)

diagnosis of cardiomyopathy with an ejection fraction of 30%.[5] (*R. at 40, 210-217.*) Plaintiff's medical records indicate that she was diagnosed with cardiomyopathy as early as 1994. (*R. at 181, 190.*) Plaintiff also has a history of asthma, gastroesophageal reflux disease, hypertension and depression. (*R. at 181, 205, 222, 254.*) In connection with her initial disability determination, Plaintiff's physical RFC was assessed at less than sedentary. (*R. at 208, 210-217.*)

Plaintiff continues to suffer from cardiomyopathy. (*R. at 255, 258.*) Additionally, in connection with her cessation of benefits determination, Plaintiff complains of constant side effects of medication including fatigue, lightheadedness, headaches, diarrhea, dry cough and trouble breathing. (*R. at 229.*) Plaintiff also complains of forgetfulness and not being able to follow simple instructions. (*Id.*)

On February 23, 1999, Plaintiff had a treadmill stress test because she was having chest pain. (*R. at 273.*) She exercised for 9.06 minutes to a maximum workload of 10.2 METs[6] and stopped because of fatigue. (*Id.*) While the test results were inconclusive because of Plaintiff's left bundle branch block, the physician administering the test concluded that Plaintiff had average aerobic work capacity. (*Id.*) Plaintiff did not experience chest pain or arrhythmia during the test and her blood

---

[4](...continued)
   palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 4.04B (emphasis added.)

[5]"Ejection fraction" is "a measurement of the heart's efficiency and can be used to estimate the function of the left ventricle, which pumps blood to the rest of the body. The left ventricle pumps only a fraction of the blood it contains. The ejection fraction is the amount of blood pumped divided by the amount of blood the ventricle contains. A normal ejection fraction is more than 55% of the blood volume." *WebMDHealth*, at http://www.my.webmd.com.

[6]A "MET" is a "unit of measure of the rate at which the body expends energy." *Merriam Webster Medical Dictionary* (Merriam-Webster, Inc. 2003), at http://www.intellihealth.com.

pressure remained normal. (*Id.*) On July 26, 1999, Plaintiff had an echocardiogram. (*R. at 266.*) It showed an estimated ejection fraction of 40-45% (*Id.*), which exceeded the § 4.04B listing requirement of 30% or less. Based on this result, the physician administering the test concluded that Plaintiff's left ventricular systolic function had improved since October of 1998 when her ejection fraction was 30%. (*Id.*) On October 2, 2001, Plaintiff had another echocardiogram done and her overall ejection fraction at that time was estimated at 40%. (*R. at 305.*)

On November 22, 2000, a state agency physician assessed Plaintiff's physical RFC and she was assessed with a light RFC. (*R. at 234-241.*) An advisory assessment of Plaintiff's physical RFC by a state agency physician on March 4, 2001, also assessed her with a light RFC. (*R. at 244-251.*)

## IV.  Discussion/Analysis

Pursuant to the sequential analysis for cessation of benefits cases[7], the ALJ found that: (1) Plaintiff has not engaged in substantial gainful activity; (2) Plaintiff's impairment does not meet the requirements of a listed impairment; (3) there has been medical improvement in Plaintiff's condition since her favorable disability determination in 1997; (4) Plaintiff's medical improvement is related to the ability to work; (5) Plaintiff's impairment is severe; and (6) Plaintiff can perform her past relevant work as an executive director. (*R. at 14-15.*) In connection with his analysis, the ALJ found that Plaintiff's past relevant work as an executive director was sedentary and that Plaintiff has

---

[7]*See* 20 C.F.R. § 404.1594(f).

the RFC to perform her past relevant work.[8]  (*R. at 15.*)   Accordingly, the ALJ concluded that Plaintiff is not disabled and her disability status was properly ceased as of December 1, 2000.

Plaintiff contends that the ALJ erred in his analysis of Plaintiff's disability.  Specifically, Plaintiff argues that: (1) the ALJ's finding that Plaintiff's medical improvement is related to the ability to work is not supported by substantial evidence and is contrary to law; (2) the ALJ failed to follow controlling legal authority in assessing the demands of Plaintiff's past relevant work and finding that Plaintiff could perform her past relevant work as an executive director; and (3) the ALJ's assessment of Plaintiff's credibility is not supported by substantial evidence and is contrary to law.  Defendant argues that the ALJ applied the correct legal standards and correctly determined that Plaintiff is not disabled based on substantial evidence.

### A.  Plaintiff's Medical Improvement Related to the Ability to Work

#### 1.  Medical Improvement

The ALJ found that Plaintiff had medical improvement related to the ability to work. (*R. at 15.*)  "Medical improvement" is defined as:

> [A]ny decrease in the medical severity of [claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [claimant was] disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [claimant's] impairment(s) . . . .

20 C.F.R. § 404.1594(b)(1).  To determine whether medical improvement has occurred, the current medical severity of the claimant's impairment must be compared to the medical severity of that

---

[8]The ALJ found that Plaintiff has the RFC to perform a significant range of light work. (*R. at 15.*)  If a claimant can perform light work, he or she can also perform sedentary work absent additional limiting factors, inapplicable in this case, such as the loss of fine dexterity or the inability to sit for long periods of time.  20 C.F.R. § 404.1567(b).

impairment at the time of the most recent favorable medical decision that the claimant was disabled. 20 C.F.R. § 404.1594(b)(7).  The Commissioner has the burden of showing there has been medical improvement. *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994).  In this case, the ALJ found that Plaintiff had medical improvement as of December 1, 2000, because the medical severity of her heart condition had decreased since she was determined disabled in June of 1997, as shown by positive changes in the symptoms, signs and laboratory findings associated with her impairment.  (*R. at 15.*)

Plaintiff was found disabled in June of 1997, based on the fact that she met the requirements of Listing § 4.04B.  (*R. at 40.*)  At the time, she was diagnosed with idiopathic cardiomyopathy and an echocardiogram performed on February 10, 1997, showed her heart had an estimated ejection fraction of 30%.  (*R. at 177-179.*)  The report of that echocardiogram noted "left ventricular mildly dilated with moderate - severe reduction in left ventricular function."  (*R. at 179.*)  A subsequent echocardiogram in October of 1998, also showed an ejection fraction of 30%.  (*R. at 264.*)

Plaintiff has been treated for her heart condition since 1997, and her condition has improved. While she still suffers from cardiomyopathy, an echocardiogram performed on July 26, 1999, showed an estimated ejection fraction of 40-45%.  (*R. at 266.*)  The doctor's impression was of "mild left ventricular enlargement with regional areas of hypokinesis that could reflect cardiomyopathy" and "mild to moderate depression of left ventricular function".  (*Id.*)  The report of that echocardiogram stated, "[w]hen compared to prior echo of October 5, 1998, the left ventricular systolic function has improved." (*Id.*)  Plaintiff's most recent echocardiogram, on October 2, 2001, showed an estimated ejection fraction of 40%.  (*R. at 305.*)  The report of that echocardiogram found Plaintiff's left ventricle "mildly to moderately dilated" with "hypokinesis of the mid and apical septal wall and mid and basal inferior wall."  (*Id.*)  Plaintiff's overall ejection fraction was "moderately depressed

8

estimated at 40%". (*Id.*) The report also noted that, compared to Plaintiff's prior echocardiogram in July of 1999, her left ventricular function appeared to be only "slightly worse." (*R. at 305.*) With an ejection fraction of 40%, Plaintiff no longer meets the requirements of Listing § 4.04B which requires a left ventricular ejection fraction of 30% or less. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 4.04B.

In addition to the echocardiograms, other evidence in the *Record* supports the ALJ's finding of medical improvement in Plaintiff's heart condition since June of 1997. A medical report by Plaintiff's physician dated April 18, 2000, noted "she denies peripheral edema or significant shortness of breath and feels quite well." (*R. at 221.*) This report also noted, "[t]he patient has done well . . . [n]o overt signs of congestive heart failure, pulmonary vascular congestion . . . [s]he denies claudication . . . [n]o chest pain consistent with ischemic heart disease," and only "moderate hypertension" and "no edema" (*Id.*) On this visit, Plaintiff's physician diagnosed moderate, slightly dilated cardiomyopathy, normal coronary arteries, no evidence of congestive heart failure and mild hypertension. (*R. at 222.*) In September of 2000, Plaintiff's physician noted she had "no significant orthopnea[9] or PND[10]. . . no symptoms of palpitations, chest pain or syncope[11]," and her extremities

---

[9]"Orthopnea" is "discomfort in breathing that is brought on or aggravated by lying flat." Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 1277-1278 (27th ed., Lippincott Williams & Wilkins 2000).

[10]"PND" is "paroxysmal nocturnal dyspnea" or "waking at night short of breath." *MedlinePlus Medical Encyclopedia*, U.S. National Library of Medicine and the National Institutes of Health, at http://www.nlm.nih.gov/medlineplus/ency.

[11]"Syncope" is "loss of consciousness and postural tone caused by diminished cerebral blood flow." "Cardiac syncope" is "fainting with unconsciousness of any cardiac cause." Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 1745 (27th ed., Lippincott Williams & Wilkins 2000).

showed "no clubbing, cyanosis, or edema." (*R. at 262.*) Her physician attributed Plaintiff's shortness of breath as probably secondary to weight gain and instructed her to start an aerobic exercise program. (*R. at 262-263.*) She was diagnosed on that visit with dilated cardiomyopathy and hypertension. (*Id.*) Although a subsequent medical report on November 27, 2000, indicated Plaintiff "feels bloated and somewhat edematous at times," her physician also noted she "has had stable symptoms" and "no PND and no orthopnea." (*R. at 260.*) This report also noted that Plaintiff was currently "without chest pain symptoms and is without palpitations or syncope," her blood pressure was better and her blood pressure medications would not be changed. (*R. at 260-262.*) On this visit, Plaintiff's physician diagnosed her with dilated cardiomyopathy and hypertension. (*Id.*) A medical report by Plaintiff's physician on February 19, 2001, noted Plaintiff's complaints of increased shortness of breath, decreased tolerance of activity, dizziness on and off, increased anxiety and lower extremity edema. (*R. at 257.*) However, this report also noted that Plaintiff's edema was usually helped by increased medication, and Plaintiff was advised to follow-up in about six months because there were no changes in her medication and "she is doing well on her heart failure and her hypertension control." (*R. at 257-258.*) On this visit, Plaintiff's physician advised her to take her medications at different times to alleviate her dizziness. (*R. at 258*). Her diagnosis on this visit was euvolemic dilated cardiomyopathy and well-controlled hypertension. (*Id.*) On February 26, 2001, a chest x-ray of Plaintiff showed "no acute cardiopulmonary disease process." (*R. at 256.*) Plaintiff's cardiac silhouette was normal in size and contour for her age. (*Id.*) On July 10, 2001, Plaintiff's physician noted that she complained of more fatigue, worsening shortness of breath, PND, orthopnea and intermittently worse lower extremity edema; however, she denied any chest pain and there was no worsening dizziness. (*R. at 254-255*.) Her physician noted trace, peripheral edema in her lower

extremities but also noted that Plaintiff was "quite severely depressed" and that "some of her symptoms could be directly related to her overall sense of lack of well being." (*R. at 254.*) He recommended that Plaintiff seek medication for her depression. (*R. at 255.*) He also increased her medication for edema. (*Id.*) Plaintiff's diagnosis on this visit was nonischemic, idiopathic cardiomyopathy, shortness of breath, depression and fatigue. (*Id.*) Her physician noted with regard to her heart condition on this visit that "she appears to be fairly stable on physical exam but her symptoms suggest some worsening." While he noted that "[t]his all could be potentially her depression," he indicated he was "somewhat worried about her heart function" and thought it reasonable to obtain another echocardiogram. (*Id.*) As previously discussed, this echocardiogram was performed on October 2, 2001, and it showed an ejection fraction of 40%. (*R. at 305.*) The last medical report in the *Record* is dated January 29, 2002. (*R. at 304.*) In that report, Plaintiff's physician noted complaints of chest discomfort, PND, orthopnea and shortness of breath, but noted that Plaintiff could walk two miles. (*Id.*) The physician found trace edema and diagnosed Plaintiff with nonischemic cardiomyopathy. (*Id.*)

Plaintiff's medical records were reviewed by two state agency physicians who completed RFC assessments for Plaintiff dated, respectively, November 22, 2000, and March 4, 2001. (*R. at 234-241, 244-251.*) These physicians concluded that Plaintiff had significant medical improvement in her heart condition demonstrated by her symptom improvement and the objective ejection fraction findings of her echocardiograms. (*Id.*) Both physicians concluded that Plaintiff's medical improvement was enough for her to do light work. (*R. at 236, 246.*)

Although Plaintiff's medical records indicate that her condition varies over time, the general improvement in her cardiomyopathy since June of 1997, documented by the ejection fraction results

of the echocardiograms and the improvement in the signs and symptoms associated with her impairment evidenced by her medical records, constitute substantial evidence to support the ALJ's finding of medical improvement.[12]

Plaintiff argues that her condition showed only "slight, fleeting improvement,"[13] which was not sufficient to support a finding of medical improvement related to the ability to work. Relying on *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996), Plaintiff argues that the ALJ erred in assessing her heart condition by mis-characterizing evidence favorable to Plaintiff and failing to explain his interpretation of the evidence. The Court disagrees. While the ALJ's discussion of the evidence is succinct, it is legally sufficient. The ALJ's decision shows he considered the full record, including Plaintiff's testimony at the administrative hearing. In his decision he cites to specific exhibits in the *Record*, including reports of medical treatment and medical tests prepared by Plaintiff's treating physicians. (*R. at 13-16.*) He discusses Plaintiff's testimony of subjective complaints and functional limitations, but concludes they do not support a finding of continued disability. (*R. at 14.*) He considers the evidence of Plaintiff's cardiomyopathy and concludes it is severe, but not severe enough to prevent Plaintiff from being able to work. (*R. at 14-15.*) The ALJ also explains his interpretation of the evidence and how it supports his conclusions related to Plaintiff's medical improvement. (*R. at 13-16.*) An ALJ is not required to discuss every piece of evidence. *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984), *cited in Clifton v. Chater*, 79 F.3d 1007,

---

[12]There is also evidence in the *Record* that Plaintiff's level of functioning has improved since 1997. For example, she is able to do some house-cleaning, take walks, walk on a treadmill, drive and go to the grocery store. (*R. at 30-32, 34-35, 56-57, 158.*)

[13]*Plaintiff's Memorandum in Support of Motion to Reverse, or in the Alternative, to Remand for a Rehearing* (*Doc. 11*), at 8.

1009-1010 (10th Cir.1996). However, this is a case where considerable evidence supports the ALJ's conclusion of medical improvement. Having reviewed the entire *Record*, the Court does not find that the ALJ mis-characterized evidence or disregarded or ignored any "significantly, probative evidence" of Plaintiff's condition which conflicted with his conclusion. *Clifton v. Chater,* at 1010. While there is some evidence in the *Record* which contradicts the ALJ's findings, the *Record* as a whole provides sufficient evidence which a reasonable mind could accept as adequate to support his conclusion of medical improvement. *See Glenn v. Shalala* at 987-988 (it is not court's task to reevaluate factual evidence and court must affirm if, considering record as a whole, there is sufficient evidence which "a reasonable mind might accept as adequate to support a conclusion." (citations omitted)).

The ALJ properly concluded that Plaintiff had medical improvement. His conclusion is supported by substantial evidence and conforms to applicable law.

### 2. Medical Improvement Related to the Ability to Work

The next step in the analysis after determining that there has been medical improvement, is determining if the medical improvement is related to the ability to do work. 20 C.F.R. § 404.1594(f)(4). Because there was medical improvement in Plaintiff's heart condition and the severity of her impairment no longer met or equaled the requirements of Listing § 4.04B as of December 1, 2001, her medical improvement was, by law, related to the ability to work. "If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, **then the medical improvement is related to [claimant's] ability to work**." 20 C.F.R. § 404.1594(c)(3)(i) (emphasis added); *see also Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994). Thus, once the ALJ found, based on substantial evidence in the *Record*, that medical improvement had occurred in Plaintiff's heart condition and her condition no longer met all

13

the requirements of Listing § 4.04B, he was obliged to find that her medical improvement related to her ability to work. Accordingly, the ALJ's finding that Plaintiff's medical improvement was related to her ability to work is is supported by substantial evidence and conforms to applicable law.

## B. Plaintiff's Past Relevant Work

Plaintiff challenges the ALJ's finding that Plaintiff could perform her past relevant work as an executive director. Specifically, Plaintiff contends that the ALJ failed to perform the analysis required by *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1996) in determining the physical and mental demands of Plaintiff's job as an executive director.

*Winfrey* requires a three-part analysis to determine if a claimant can perform his or her past relevant work. This analysis requires that an ALJ: (1) evaluate the claimant's physical and mental residual functional capacity; (2) determine the physical and mental demands of the claimant's past relevant work; and (3) determine if the claimant can meet the demands of his or her past relevant work given the limitations of the claimant's residual functional capacity. *Winfrey* at 1023. Plaintiff argues that the ALJ erred at step two of the *Winfrey* analysis by failing to inquire of Plaintiff or make specific findings regarding the physical and mental demands of her past relevant work as an executive director. The Court disagrees.

The *Record* contains a Work History Report prepared by Plaintiff which includes a detailed description of her job as an executive director.[14] (*R. at 132-146.*) This report describes the demands of the executive director position as it was performed by Plaintiff. (*R. 134-136, 146.*) The report includes factual information regarding: job duties; number of hours of the workday spent walking,

---

[14]Plaintiff also gave some brief testimony at the administrative hearing about her job as an executive director. (*R. at 33-34.*)

standing and sitting; machines, tools and equipment used; plans, blueprints, manuals or instructions made or followed; writing and similar duties; supervisory responsibilities; frequency of stooping, crouching, climbing, lifting and carrying; and stress level. (*Id.*) In reliance on this report, the ALJ specifically found that Plaintiff's past relevant work as an executive director "was sedentary as she performed it." (*R. at 15*). He also found that the functional demands of the executive director position did not exceed Plaintiff's retained residual functional capacity to perform a significant range of light work. (*R. at 15.*) The ALJ concluded, in compliance with *Winfrey*, that: (1) Plaintiff retained the residual functional capacity to perform a significant range of light work; (2) Plaintiff's past relevant work as an executive director was sedentary as she performed it; and (3) Plaintiff had the ability to meet the demands of her past relevant work as an executive director given her retained residual functional capacity. (*R. at 15.*)

The cases cited by Plaintiff on this point are distinguishable. In *Henrie v. U.S. Department of Health & Human Services*, 13 F.3d 359 (10th Cir. 1993), unlike this case, there was no inquiry regarding the demands of the claimant's past relevant work and the record was "devoid of evidence" on this issue. *Henrie* at 361. *Henrie* was remanded for further development of the factual record regarding the demands of the claimant's past relevant work. *Id.* In *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1996), where the claimant suffered from a mental impairment, the ALJ made no inquiry into, and no findings specifying, the mental demands of the claimant's past relevant work. *Winfrey* was also remanded for further development of the factual record. *Winfrey* at 1026.

The present case is closer on its facts to the unpublished case of *Westbrook v. Massanari*, 26 Fed. Appx. 897, 2002 WL 193911 (10th Cir. (N.M.)). In *Westbrook*, there was evidence of the demands of the claimant's past relevant work as an administrative assistant in a description she

15

prepared and in testimony at the administrative hearing. *Westbrook* at *903, **5. Based on that evidence, the ALJ found that the claimant could perform light, semi-skilled work including her past relevant work as an administrative assistant. *Westbrook* at *902, **4. On appeal, the claimant argued that the ALJ failed to adequately discuss the demands of her past relevant work in accordance with *Winfrey*. *Id.* at *903, **5. The Tenth Circuit Court of Appeals affirmed the ALJ's assessment of the demands of the claimant's past relevant work in reliance on the evidence in the record and noted that:

> [O]ur holding in *Winfrey* . . . is not designed to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability. Rather, its concern is with the development of a record which forms the basis of a decision capable of review.

*Westbrook* at *903, **5. The Court of Appeals found there was substantial evidence in the record that the claimant could return to her past relevant work as an administrative assistant and refused to require more detailed findings regarding the demands of the claimant's past relevant work. *Id.*

In this case, the Work History Report prepared by Plaintiff and relied on by the ALJ contained a detailed description of Plaintiff's past relevant work and there was sufficient information in this report for the ALJ to determine the demands of Plaintiff's past relevant work. The Court concludes that the ALJ's reliance on the Work History Report fulfilled his responsibility to obtain adequate factual information about the demands of Plaintiff's past relevant work. Additionally, the Court concludes that the ALJ's findings that Plaintiff's past relevant work was sedentary, and that its functional demands did not exceed her retained residual functional capacity, conform to applicable law.

## C. Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. The ALJ evaluated the evidence and concluded that Plaintiff's testimony of subjective complaints and functional limitations, while generally credible, did not support a finding of continued disability. (*R. at 14.*) Most of the ALJ's credibility assessment has to do with the discrepancy between Plaintiff's allegations of a severe, disabling, heart impairment and her medical records indicating considerable improvement in her condition. (*R. at 14-15.*) Plaintiff isolates one issue and argues that the ALJ misstated the record in his analysis of Plaintiff's credibility with regard to the side effects of her medications.

"Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Sec'y. of Health and Human Services*, 898 F.2d 774, 777 (10th Cir. 1990). However, such deference is not absolute. *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).

In his discussion of Plaintiff's credibility, the ALJ noted that although she claimed to suffer serious side effects from her medications, including dizziness and vision problems, her medical records do not corroborate these complaints. (*R. at 14.*) In this regard, he found that Plaintiff never mentioned any side effects to her treating physicians. (*R. at 14-15.*) Plaintiff argues that this finding misstates the *Record* and points to Plaintiff's testimony at the administrative hearing that she experienced indigestion when she began taking the drug "Coreg" (*R. at 28-29*), and to her complaints of indigestion after taking "Coreg" during a visit to her physician on February 19, 2001 (*R. at 257*). Plaintiff also points to her complaint during the same visit of "dizziness on and off," and her

17

physician's adjustment of the timing of her medications in an effort to "decrease the episodes of dizziness she has been experiencing." (*R. at 257-258.*) Plaintiff also points to evidence in the *Record* that she complained to a Social Security Administration employee on August 25, 2000 that her medications made her feel tired (*R. at 161*) and repeatedly alleged that she was fatigued (*R. at 53, 157, 159*).

While the ALJ's finding that Plaintiff "never mentioned any side effects [of medications] to her treating doctors" (*R. at 14-15*) is contradicted by the evidence cited above concerning her complaints of indigestion and dizziness, this evidence does not contradict the ALJ's finding that there are no medical records to corroborate Plaintiff's subjective complaints of dizziness and vision problems from her medications. (*R. at 14.*) That is, the evidence cited by Plaintiff does not confirm that Plaintiff's medications caused her to suffer from serious dizziness and vision problems. Nor does this evidence contradict the ALJ's finding that despite claims of dizziness while driving, Plaintiff continues to drive frequently and has, on several occasions, driven from Las Cruces to Albuquerque alone. (*R. at 15, 30, 34-35, 37.*) The Court finds that the ALJ properly noted the inconsistency between Plaintiff's complaints of serious dizziness and vision problems caused by her medications and the lack of corroborating medical evidence in assessing Plaintiff's credibility. The ALJ also properly noted the inconsistency between Plaintiff's complaints of serious dizziness and vision problems and her driving activities. With regard to Plaintiff's allegations of fatigue, even the ALJ acknowledged that Plaintiff tires easily and took this into account in reaching his decision.[15] (*R. at 15.*) However,

---

[15]The ALJ noted, based on evidence in the *Record*, that despite her fatigue Plaintiff was able to care for her home and take care of her personal needs. (*R. at 15.*) He also noted the improvement in her heart condition demonstrated by the medical evidence and the improvement in her level of functioning evidenced by the fact that she was able to do some cleaning, take walks, walk on a
(continued...)

the evidence in the *Record* cited by Plaintiff does not corroborate that Plaintiff's fatigue was caused by her medications.

In this case, the ALJ closely and affirmatively linked his credibility findings to substantial evidence in the *Record*. The ALJ properly analyzed Plaintiff's testimony and the other evidence in the *Record* and outlined the reasons for his evaluation of Plaintiff's credibility. The reasons given by the ALJ for his findings regarding Plaintiff's credibility comply with applicable law and are supported by substantial evidence in the *Record*.

.  **V. Conclusion**

Based on the foregoing, the Court **FINDS** that the Commissioner's decision is supported by substantial evidence in the *Record* as a whole and comports with relevant legal standards. Accordingly, the Court will **AFFIRM** the decision of the Commissioner and **DENY** Plaintiff's motion.

**WHEREFORE, IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and Plaintiff's Motion to Reverse and Remand for Reinstatement of Benefits, or in the Alternative, for a Rehearing (*Doc. 10*) is **DENIED**. A final order will be entered concurrently with this Memorandum Opinion and Order.

---

[15](...continued)
treadmill, drive to Albuquerque for doctor's appointments, and go to the grocery store. (*Id.*) (*See also R. at 30-32, 34-35, 56-57, 158.*)

**IT IS SO ORDERED.**

                                                                   _/s/ Lourdes A. Martínez_
                                              **LOURDES A. MARTÍNEZ**
                                              **UNITED STATES MAGISTRATE JUDGE**
                                              **Presiding by Consent**